MAR-28-2003  14:11        THOMPSON COBURN-BELLEVILL          1618 236 3434   P.02/24

## IN THE CIRCUIT COURT FOR THE TWENTIETH JUDICIAL CIRCUIT
## ST. CLAIR COUNTY, ILLINOIS

JEROME KORTE and LANA KORTE,  )
                           )  03-239 WDS
       Plaintiffs,     )
                           )
     v.            )  No. 2003-L- 158
                           )
EXXONMOBIL COAL USA, INC.     )
                           )
       Defendant.     )

**FILED**
ST. CLAIR COUNTY
**MAR 2 1 2003**
22 0 ꟷ ꟷ ꟷ ꟷ   CIRCUIT CLERK

## COMPLAINT FOR DAMAGES

NOW COMES the Plaintiffs, Jerry Korte and Lana Korte, by and through their attorney, PENNI S. LIVINGSTON, and Complaining of the Defendant ExxonMobil Coal USA, Inc. and its Monterey Coal Company Division as follows:

### Count I

### Nuisance from Air Pollution and Land Deposition of Air Particles

1. This Complaint is brought in tort by Jerry Korte and Lana Korte pursuant to common law private nuisance, trespass, breach of quiet enjoyment of property, negligence, public nuisance, negligent infliction of emotional distress, and fear of disease. This case is about quality of life. The case involves environmental impacts, personal injury, property damage, and business loss caused by on-going exposure to contaminated water, soil and air. This exposure and the resulting harms and damages were caused by a neighboring coal processing facility's elevated 271 acre coal refuge disposal area located about 4,000 feet south of the Korte farm and home. This 271 acres of waste materials have been left uncovered and therefore exposed even though the operation closed over six years ago. This lack of cover material (dirt) over the coal waste has allowed blowing waste material dust onto the Korte farm and into the house (and air). Exposure to chemical poisons was also brought to the Kortes by their friendly neighborhood Corporate conglomerate by means of a deliberate or negligent purge in the groundwater table that placed the coal waste directly into the Korte drinking water.



2.  The Korte family resides in Mascoutah, Illinois in St. Clair County, having had to find another place to live last year. The Korte family owns about 40 acres along Highway 161 between Germantown and Albers, IL. They sell market produce, eggs and other products from their farm. Mr. Korte's parents started the produce business in 1944.  Jerry and Lana Korte resided at 6727 State Rd. 161, Germantown, IL 62245 and operated 3 businesses on their 40 acres of farm ground: 1) Korte's Country Fresh, market produce and eggs—a family business since 1944. 2) Jerry Korte's Used Cars, since 1997 and 3) Jerry Korte's Equipment, a silage bagging business, since 1983.  The Kortes conducted education tours of their working farm for local school children since the mid-1990s.  Produce now sold at the Korte farm is grown in Mascoutah.

3.  ExxonMobil Coal USA, Inc. (hereinafter "ExxonMobil") is a Delaware  Corporation registered to do business in Illinois as of 12-3-79 and it is in good standing.  The President is JT McMillian at 2401 S. Gessner in Houston, Texas 77063.  The Registered Agent is Illinois Corporation Service Co. at 700 South Street in Springfield, Illinois 62704. Exxon Mobil Corporation is a New Jersey company registered to do business in Illinois since 12-01-72.  Monterey Coal Company is a division of ExxonMobil Coal USA.  Exxon's Monterey Coal facility is Clinton County between Albers and Germantown on Route 161.  Monterey Coal is the named owner and operator of the Monterey Coal mine which is the subject of this lawsuit. Monterey Coal Company is wholly owned by ExxonMobil Coal USA.  ExxonMobil Coal has been sued in St. Clair County and does business in St. Clair County.

4.  The Monterey Coal Company (a division of ExxonMobil Coal USA) operated the Albers #2 mine to the south and southeast of the Korte farm approximately from 1977 to 1996 when the mine was closed. The company mined the Herrin (#6) Coal.  Since 1996, the Coal Company has sealed the shafts and removed or sold the equipment from the preparation plant, rails, silos and

2

other surface and underground equipment. Much of the land has been sold or is for sale, yet they
have not made progress on the IEPA Corrective Action Plan for the covering and sealing of the
waste pile (January 9, 2001, letter to IEPA). It is not known when the cover activity will start or how
long it will take to reduce the dust from the waste pile. Certainly, it will take several years for the
work to be approved by IEPA and work to be completed.

    5. On or about a date to be determined and continuing to at least the date of filing, large
dust storms, which rise from the unreclaimed, exposed, elevated coal waste area belonging to the
Defendant have blown unto the Korte property, farmland buildings, yard, and into the house. When
the wind is from the southeast, south and southwest (which are the dominant wind directions) dust
blows across and settles on their farm.   This activity has occurred for many years.

    6. Surface dust from within the Korte home, where no EPA standards are known, indicate
levels of Arsenic, Beryllium, Cadmium, Chromium, Lead, nickel, mercury, and cyanide. The above
toxic metals and elements are in the air and even in the home where the Kortes live. The pollutants
and carcinogens are in their cars, their clothes, sticking to the walls of all the buildings and on the
floors they walk on and the soil from which they derive their living.

    7. The Kortes are very fearful for their health and their short-term and long-term economic
situation. The Kortes have experienced sinus problems, skin and eye irritation, lung congestion,
headaches, insomnia,  and fear for their short-term and long-term health. The health problems
suffered by the Kortes are consistent with exposure to the "cocktail" mix of chemicals from the dust
emanating from the 271 acres of ExxonMobil waste materials known as the "gob pile."  This air
borne exposure to the chemicals and compounds transferred through the gob dust and exposure
to the deposition of  particles from the gob dust into the soil where the Kortes worked and into their
house where they lived,  is the proximate cause of the illnesses, symptoms,  and personal injury

that the Kortes have suffered.

8. Several rabbits and baby rabbits died as a result of southerly exposure from the gob materials being wind blown into the air and into the water dishes of the rabbits. The rabbits that lived failed to breed regularly and eventually some stopped breeding until their death. These were healthy rabbits until they resided at the Korte farm. A cat and several baby kittens have died as well from exposure to wind blown gob.

9. Dust on flat surfaces in the Korte structures, their farm equipment and automobiles are a continual problem. The paint washes away on the cars and farm machinery on the Korte farm and rapid decay of roofs and wood exposed to the dust coming from the south has also occurred. The Kortes have had unusual "bitterness" in some of their fruits and vegetables, areas of "red soil" in their fields and unusual burning of plants. These occurrences were proximately caused by gob dust exposure allowed by the Defendants.

10. The situation with the Kortes' health and stress from exposure became so paramount that in February 2002, the Kortes moved out of the farm and have been residing elsewhere as of the filing of this Complaint. After having vacationed in Florida for two weeks and having felt better and then having returned to the family home thereafter, the Kortes became even more aware of exposure as they immediately returned to stronger health symptoms upon returning. These symptoms included bloody noses, spitting up flem, skin rashes and blistering, not being able to breath or sleep and the like.

11. The Kortes raised market vegetables, such as asparagus, strawberries, pumpkins, tomatoes and other crops such as popcorn. They stopped operating their produce business as working in the contaminated soil and air was causing constant symptoms and illnesses and extreme

4

stress and they were concerned about harming their neighbors from produce grown on such land
This has caused great loss to the Kortes in personal income (and in business pride and reputation.

12. The Kortes had operated a silage bagging business for nearly 20 years. Mr. Jerry Korte began experiencing respiratory illness and rashes around 1997. Not knowing any different at the time, Mr. Korte assumed it was from the silage business since he continued to experience these uncomfortable symptoms. He therefore, sold off the silage business in 2000 while such business continued to make a very good profit and provided well for Mr. Korte's family. Mr. Korte has now learned that it was the exposure to gob particles that caused these symptoms and after his water turned black he started an investigation.

13. Elements found in Illinois coal include arsenic, beryllium, cadmium, cobalt, chromium, mercury, manganese, nickel, phosphorus, lead, antimony, selenium, thorium and uranium. Most of the above are listed as Hazardous Air Pollutants (HAPS) and some are listed as carcinogens.

14. Soil samples taken from the Korte farm show Arsenic, Beryllium, Cadmium, Mercury, iron, and Lead. Chemical analysis illustrates selective metals in the soil in which the Kortes are growing crops and working in. When compared to the Herrick Soil, that is outside of the influence of the dust rising from the coal waste piles, the cause and origin of the metals in the farm soil is obvious. The Korte's work on small tractors and on their hands and knees and not only are breathing the toxic materials in the air, but are breathing the metals attached to the surface soils which becomes airborne when dry and worked by farming practices. In the writer's opinion, the reported "red spots" are areas of iron concentration. Very disturbing is the amount of iron and lead in the soil which can be inhaled and the mixture of materials that are considered human carcinogens.

5

15.  ExxonMobil created a nuisance by not properly dealing with their 271 acre "gob" pile, by leaving it uncovered and uncared for, thereby allowing wind blown gob particles to exit their property and contaminate the air and property of the Kortes.  This dust contamination nuisance created by the Defendant caused the Plaintiffs damage through health problems, stress, property damage, and business and income loss.

WHEREFORE, for all the reasons stated herein, the Plaintiffs request that this Court set this matter for jury trial and the Plaintiffs request that the jury:

1) Find that the Defendant ExxonMobil created and maintained a Nuisance from air pollution and deposition of particles;

2) Find that the Nuisance caused harm and damages to the Plaintiffs;

3) Find that the Defendant acted or failed to act in a manner that thereby caused harm to the Plaintiffs' health and property;

4) Enter Judgment against the Defendant ExxonMobil for compensatory damages in an amount that exceeds $12 Million. Plus costs of suit;

5) Find that punitive damages are appropriate after a hearing is held by the Judge for such determination and upon finding that punitive damages are allowed and appropriate, find the Defendant liable for punitive damages up to $50 million.

6

## COUNT II

## NEGLIGENCE RESULTING IN AIR POLLUTION

1 Through 15.  The Plaintiffs reallege and repeat paragraphs one through fifteen of Count I as though fully set forth at length herein.

16.  The Defendant is guilty of negligently and carelessly failing to properly cover the 271 acre coal processing waste area known as "gob." Defendant negligently and carelessly failed to stop fugitive gob dust from leaving their premises and traveling to the Korte farm.

17.  As a direct and proximate result of this failure to act by covering the 271 acre waste area and failure to stop gob dust transport, the Defendant allowed air pollution that exposed the Kortes to particles.

18.  The facility has been closed down since 1996 and they have not reduced the fugitive dust nor have they even initiated cover. The coal company delivered a "Corrective Action Plan" (CAP) to the IEPA on August 28, 2000 and an addendum to the CAP on 9 January 2001. In these documents, they proposed a cover system for the gob/slurry area which will reduce rainfall infiltration into the underlying aquifer to 0.02 inches/year and will reduce the dust blown off the pile when it is vegetated. This many years later and they are still proposing solutions, not implementing them.

19.  As a direct and proximate result of this negligent omission or failure to act by the Defendant, the Plaintiffs, Jerome and Lana Korte, were severely and permanently injured and any existing condition was aggravated. Plaintiffs have suffered physical and mental pain and anguish and have incurred medical expenses and will incur further indebtedness for medical expenses in the future. The Plaintiffs have been and will hereafter be prevented from attending their usual and

7

regular affairs, duties, employment, and occupation and have been and will hereafter be deprived of great gain, profit, salaries and wages which they would otherwise have acquired, earned, made or received, all to the Plaintiffs' damage.

WHEREFORE, for all the reasons stated herein, the Plaintiffs request that this Court set this matter for jury trial and the Plaintiffs request that the jury:

1) Find the Defendant ExxonMobil had a duty to cover the gob waste and perform closure work in a workmanlike manner;

2) Find the Defendant breached its duty and failed to meet the standard of care;

3) Find that Defendant's breach of duty was the cause in fact and the proximate cause of harm to the Plaintiffs and their property;

4) Find that the Defendant acted or failed to act in a manner that thereby caused harm to the Plaintiffs' physical and mental health;

5) Find the Defendant's actions to have involved negligence and gross negligence;

6) Find the Defendant guilty of Negligence and liable to each Plaintiff for compensatory and future damages of $12 Million plus cost of suit;

7) Find that punitive damages are appropriate after a hearing is held by the Judge for such determination and upon finding that punitive damages are allowed and appropriate, find the Defendant liable for punitive damages up to $50 million.

8

## COUNT III

## NUISANCE FROM CONTAMINATION OF WELL WATER

1. Through 8. The Plaintiffs reallege and repeat paragraphs one through eight of Count I as though fully set forth at length herein.

9. On or about June 20, 2001, black water flowed from the Korte well into the faucets of the house. The Kortes use well water from the Pearl Aquifer for drinking water, domestic uses such as bathing, washing, cooking and farming uses such as irrigation for plants and watering of animals. Other local farmers report black water and water with a "rotten egg" smell during this time as well.

10. Testing of the well water at the Kortes indicated the presence of foreign substances such as lead. Water samples, both groundwater and surface were taken and tested. The results were provided to ExxonMobil and will be presented at trial. The background level well, to the northeast of the Korte property, did not contain measurable amounts of the toxic lead that is found in the Korte well. The lead content in the Korte well was 0.454 mg/L, which is considerably above the EPA drinking water action level of 0.015 mg/L.).

11. The Kortes discontinued use of water for drinking and cooking and used bottled water for these purposes and for the animals. The Kortes eventually had to stop using the water for bathing and washing as well as they continued to experience rashes and other skin irritations. Also they noticed that their clothes and towels were dusty even after being washed.

12. Since some date known only to the defendant, ExxonMobil had been pumping approximately 500,000 or one half a million gallons of water from the Pearl Aquifer each day for a total of 15 million gallons of water per month from the Pearl Aquifer. This groundwater is being pumped to keep it from touching contaminants and causing them to flow off site.

13. Neighbors watching the waste confining areas being constructed noticed that the

9

surface soil was removed from on top of the aquifer and artesian pressure formed a lake in the bottom of the disposal area. It is not known if the gob and slurry was piled directly in contact with the Pearl Aquifer. Whatever was done, pollution began to show up in the surrounding monitoring wells in 1986. The effects of subsidence are also not known as to the effect of allowing contaminants to seep into groundwater.

14. The Defendant built a recirculation lake which received waste water from the coal preparation plant and recirculated the water back to the plant. It is not know if the lake naturally intercepted the Pearl Aquifer or if the lake was partially excavated and the Aquifer was encountered. If the lake is losing water to the pumped Aquifer, the polluted water in the lake is moving into the Aquifer. Most of the water quality data collected under the Surface Mining Act Permit and the Waste Water Permit occurred in the company's groundwater monitoring zone on company property. Limited data was collected from surrounding rural wells. The coal company has listed the water quality constituents of concern as: total dissolved solids (TDS), sulfate, chloride, iron and manganese. It is not know if the company has tested in the past for other metals or compounds.

15. The Defendant delivered a "Corrective Action Plan" (CAP) to the IEPA on August 28, 2000 and an addendum to the CAP on January 9, 2001. In these documents, they proposed a cover system for the gob/slurry area which will reduce rainfall infiltration into the underlying aquifer to 0.02 inches/year and will reduce the dust blown off the pile when it is vegetated. They also propose to deactivate the pumping of the aquifer (now 500,000 gal/day) after 10 years. Their greatest concern identified is monitoring down gradient wells (south and southeast of the waste disposal area).

16. The groundwater aquifer, which underlies the area, is a unique resource in southern and central Illinois and is known as the Pearl Aquifer. The sandy Pearl Formation is an Illinoian age glacial/fluvial deposit that is normally found in major stream valleys, such as the Kaskaskia River

Case 3:03-cv-00239-GPM-PMF   Document 2   Filed 04/15/03   Page 11 of 23   Page ID #11

Valley. In this case, the Pearl Formation is an upland unit, which extends from about Breese in the north, south to Germantown and Albers. The aquifer has been mapped as glacial outwash material, sandy, about 40 feet in thickness and covered with about 10 feet of Wisconsian age loess. This aquifer has artesian pressure. The Kortes and their neighbors had shallow wells yielding a good quality water and in ample quantity. The Pearl Aquifer is a unique, very valuable upland rural water source.

17. Berg, Kempton and Cartwright (1984) of the Illinois State Geological Survey (ISGS) conducted a study for the IEPA entitled "Potential for Contamination of Shallow Aquifers in Illinois". The major concern was the land burial of waste on the surface or near surface and the potential pollution of groundwater aquifers. They mapped the top 50 feet of surface of the State and denoted pollution potential of the groundwater. They stated, "For natural protection of groundwater, Illinois has used this guideline for years: at least 30 feet of relatively impermeable (fine-grained, tightly packed) material capable of attenuation should separate the base of a landfill from an aquifer". The Pearl Aquifer in the study area is listed as "The potential for contaminating shallow aquifers is high". Also, ".......the overlying silt materials provide some protection of the aquifer and the silt provides some attenuation".

18. Cartwright and Sherman (1969) evaluated sanitary landfill sites. They reached the following conclusions that apply to the situation where ExxonMobil sited the waste disposal site. "....type of material—sand and gravel—unfavorable; thickness of unconsolidated material—<50 feet—unfavorable; local sources and potential sources of water—sand and gravel wells with logs showing thin cover over aquifer—unfavorable; site topography—flat upland areas—favorable". The coal company violated 3 out of the 4 criteria recommended to IEPA by State geologists.

19. ExxonMobil ignored these risks and has managed to contaminate this otherwise pristine source of drinking water. In or around a year known to the Defendants, while digging out dirt for placement of more "gob" the company hit groundwater. They may have used the gob that was all

11

over to  cover the hole(s), thereby allowing a source of contamination.  At any rate, gob and its constituents have leached into the groundwater.

20. ExxonMobil negligently designed the waste pile area constituting 271 acres of elevated waste not properly covered.  The Defendant negligently ignored the importance of the aquifer for the local rural population.

21.  Coal can contain a large number of various metals, some of which are know to be poisonous or be a possible cause of cancer and other health problems.  The metals or elements found in Illinois coal as arsenic, beryllium, cadmium, cobalt, chromium, mercury, manganese, nickel, phosphorus, lead, antimony, selenium, thorium and uranium.

22.  Metal ions normally do not move well in surface soils, but attach to clay and some fine silts and become somewhat immobile. Because nearly all of the surface soils in the local area are wind-blown glacial loess (mainly silts with clays attached to the silts) and the subsoils are high in clay, metals normally stay close to the point of origin. In the sandy Pearl Formation, some silts and clays are present and would normally move very slowly. But, if a water well is pumped, with large production of groundwater, silts and clays will move. The coal company is pumping 500,000 gal/day from the aquifer and placing the water into a ditch, leading to the company recirculation lake and then into Grassy Branch, Sugar Creek and the Kaskaskia River—an important source for drinking water in the other local communities.

23. Samples were taken from: 1) the ditch at Hunter Road (representative of metals moving in the polluted groundwater), 2) Grassy Branch at Albers Road (pollutants released into surface stream) and 3) from upper Grassy Branch (2 miles north of the waste piles) representative of dust materials washed into nearby surface stream.  These samples illustrate the metals that are attached to silts and clays in the bottom of surface streams. In other words, the Defendant has polluted near-by surface water as well as the groundwater.

12

WHEREFORE, for all the reasons stated herein, the Plaintiffs request that this Court set this matter for jury trial and the Plaintiffs request that the jury:

1) Find that the Defendant ExxonMobil created and maintained a Nuisance from groundwater pollution;

2) Find that the Nuisance caused harm and damages to the Plaintiffs;

3) Find that the Defendant acted or failed to act in a manner that thereby caused harm to the Plaintiffs' health and property;

4) Enter judgment against the Defendant ExxonMobil for compensatory damages in an amount that exceeds $12 Million plus cost of suit;

5) Find that punitive damages are appropriate after a hearing is held by the Judge for such determination and upon finding that punitive damages are allowed and appropriate, find the Defendant liable for punitive damages up to $50 million.

## COUNT IV

## NEGLIGENCE RESULTING IN GROUNDWATER CONTAMINATION

1. THROUGH 23.  Plaintiffs reallege and repeat paragraphs one through twenty-three of Count III as though fully set forth at length herein.

24.  The Defendant is guilty of negligently and carelessly failing to properly cover the 271 acre coal processing waste area known as "gob."  Defendant negligently and carelessly failed to stop the contaminants from this waste gob from getting into the Pearl Aquifer and further from getting into the Korte well.

13

25. As a direct and proximate result of this failure to act by covering the 271 acre waste area and failure to stop the gob contaminant transport into the groundwater, the Defendant allowed water pollution that exposed the Kortes to contaminants and has taken away their use of their groundwater/well-water.

26. The Defendants have known about the groundwater contamination since 1986. They have caused further contamination to the North through their pumping of 500,000 gallons a day from the aquifer.

27. As a direct and proximate result of the Defendant's negligent acts or omissions and failures to act , the Plaintiffs, Jerome and Lana Korte, have been severely and permanently injured and their groundwater has been rendered useless and harmful. Adverse health effects were caused by this negligence and any existing health condition was aggravated by exposure to this contaminated groundwater. Plaintiffs have suffered physical and mental pain and anguish and have incurred medical expenses and will incur further indebtedness for medical expenses in the future. The Plaintiffs have been and will hereafter be prevented from attending their usual and regular affairs, duties, employment, and occupation and have been and will hereafter be deprived of great gain, profit, salaries and wages which they would otherwise have acquired, earned, made or received, all to the Plaintiffs' damage.

28. ExxonMobil received a "covenant not to sue" from the George Ryan administration in return for granting one million dollares to hook people up to public water supply due to the fact that the coal mine had contaminated the groundwater. The State in return, in an unprecedented move, subsidized two million dollars to hook people up to public water supply. ExxonMobil contaminates the water supply and gets the government to pay for 2/3 of the cost of hooking people up to a different and uncontaminated supply of water.

WHEREFORE, for all the reasons stated herein, the Plaintiffs request that this Court set this

matter for jury trial and the Plaintiff' request that the jury:

1) Find the Defendant ExxonMobil had a duty to not contaminate the groundwater;

2) Find the Defendant breached its duty and failed to meet the standard of care;

3) Find that Defendant's breach of duty was the cause in fact and the proximate cause of harm to the Plaintiffs and their property;

4) Find that the Defendant acted or failed to act in a manner that thereby caused harm to the Plaintiffs' physical and mental health;

5) Find the Defendant's actions to have involved negligence and gross negligence;

6) Find the Defendant guilty of Negligence and liable to each Plaintiff for compensatory and future damages of $12 Million plus cost of suit;

7) Find that punitive damages are appropriate after a hearing is held by the Judge for such determination and upon finding that punitive damages are allowed and appropriate, find the Defendant liable for punitive damages up to $50 million.

## COUNT V

### TRESPASS

1 through 19. The Plaintiff reálleges and repeats paragraphs 1 through 19 of Count II as though fully stated herein.

20 through 34. The Plaintiff realleges and repeats paragraphs 9 through 23 of Count III as though fully stated herein.

15

35.  As the Defendant has caused contamination of the Korte property and exposure to contaminants from air and water pollution caused or allowed by the Defendants, the Defendants are guilty of trespass.

36. As property owners, the Plaintiffs have a protected right to use and enjoy their property.

37.  Upon information and belief, the Defendant intentionally invaded the Plaintiffs' interest in the use and enjoyment of their property in that it managed harmful wastes near residential property, including Plaintiffs' property, in a manner which it knew or should have known, would substantially result in contamination to Plaintiffs' property.

38. The migration of hazardous constituents and wastes onto Plaintiffs' property constitutes substantial and unreasonable invasion of the use and enjoyment of Plaintiffs' land.

39.  The conditions created by ExxonMobile endangers the Plaintiffs' health and lives, offending the senses, damaging their property, their business and their home, and preventing comfortable and reasonable use of the property.

40. Plaintiffs property has been damaged and has been diminished in value, and Plaintiffs have lost the use and enjoyment of their property.

**WHEREFORE**, for all the reasons stated herein, the Plaintiffs request that this Court set this matter for jury trial and the Plaintiffs request that the jury:

1) Find that the Defendant ExxonMobil committed the offense of trespass;

2) Find that the Defendant's trespass caused harm and damages to the Plaintiffs;

16

3) Enter judgment against the Defendant ExxonMobil for compensatory damages in an amount that exceeds $12 Million plus costs of suit;

4) Find that punitive damages are appropriate after a hearing is held by the Judge for such determination and upon finding that punitive damages are allowed and appropriate, find the Defendant liable for punitive damages up to $50 million.

## COUNT VI

## STIGMA TO PROPERTY FROM CONTAMINATION IN THE VICINITY

1.  The Plaintiffs reallege and repeat all paragraphs of each count as if stated herein.

2.  The stigma of living near the 271 acre gob pile and the effects of that pile have created a stigma to all the property in and around the surrounding area and have rendered the Korte farm property and the produce business practically valueless compared to its previous value.

3.  As a direct and proximate result of the Defendant's negligent acts or omissions and failures to act and the creation of stigma around the contaminated gob area, the Plaintiffs, Jerome and Lana Korte, have been severely and permanently injured from a reduction in value of the property and the elimination of their business.

WHEREFORE, for all the reasons stated herein, the Plaintiffs request that this Court set this matter for jury trial and the Plaintiffs request that the jury:

1) Find that the Defendant ExxonMobil created a stigma to the property owned by the Plaintiffs from the contamination in the vicinity of the Plaintiffs' property;

2) Find that the Defendant's actions or inactions caused harm and damages to the Plaintiffs in lost revenue and in lost value of property;

17

3) Enter judgment against the Defenda:   ExxonMobil for compensatory damages in an amount that exceeds $12 Million plus costs of suit;

4) Find that punitive damages are appropriate after a hearing is held by the Judge for such determination and upon finding that punitive damages are allowed and appropriate, find the Defendant liable for punitive damages up to $50 million.

## COUNT VII

## NEGLIGENT OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

1 Through 48.  The Plaintiffs reallege and repeat as though fully stated herein paragraphs one through fifteen of Count I, paragraphs 16 through 19 of Count II, paragraphs nine through twenty-three of Count III, paragraphs twenty-four through twenty-eight of Count IV, paragraphs thirty-five through forty of Count V, and paragraphs one through three of Count VI.

49.  Plaintiffs have suffered tremendous effects from the actions and inactions of the Defendants. Plaintiffs have suffered emotional distress and mental illness caused by the negligence and intentional acts and inaction of the Defendant.  But for the Defendant's actions and inactions, Plaintiffs would not have suffered emotional distress.

50.  Plaintiffs' have suffered severe symptoms that interfere with daily life and work.  These symptoms include depression,  chronic fatigue, central nervous system damage, respiratory and mucosal irritation, gastrointestinal problems, difficulty concentrating, memory loss, weakness, dizziness, headaches, withdrawal from family and social activities, limited contacts with friends in the community, sleep apnea, and post traumatic stress disorder.  The depression and anxiety disorders have included panic attacks.

18

51. Plaintiffs' did not suffer from symptoms set forth herein prior to exposure to blowing coal waste dust.

**WHEREFORE,** for all the reasons stated herein, the Plaintiffs request that this Court set this matter for jury trial and the Plaintiffs request that the jury:

1) Find the Defendant ExxonMobil intentionally or negligently caused emotional distress to the Plaintiffs;

2) Find that the Defendant acted or failed to act in a manner that thereby caused harm to the Plaintiffs' physical and mental health;

3) Find the Defendant's actions to have involved negligence, gross negligence or intentional conduct;

4) Find the Defendant guilty of Intentional or Negligent Infliction of emotional distress and liable to each Plaintiff for compensatory and future damages of $12 Million plus cost of suit;

5) Find that punitive damages are appropriate after a hearing is held by the Judge for such determination and upon finding that punitive damages are allowed and appropriate, find the Defendant liable for punitive damages up to $50 million.

## COUNT VIII

### MENTAL ANGUISH FROM FEAR OF DISEASE

1 through 48. The Plaintiff realleges and repeats paragraphs 1 through 48 of Count VII as though fully stated herein.

19

49.  Plaintiffs have suffered tremendous effects from the actions and inactions of the Defendants. Plaintiffs have suffered emotional distress and mental illness caused by the negligence and intentional acts and inaction of the Defendant. But for the Defendant's actions and inactions, Plaintiffs would not have suffered mental anguish from fear of disease.

50.  Plaintiffs' have suffered severe symptoms that interfere with daily life and work.  These symptoms include depression,  chronic fatigue, central nervous system damage, respiratory and mucosal irritation, gastrointestinal problems, difficulty concentrating, memory loss, weakness, dizziness, headaches, withdrawal from family and social activities, limited contacts with friends in the community, sleep apnea, and post traumatic stress disorder.  The depression and anxiety disorders have included panic attacks.

51.  Plaintiffs suffer mental anguish from the increased risks of disease from exposure to the Defendants 271 acre pile of poison.  Defendants have been told of an increased risk of cancer. This belief in the increased risk was caused by the negligence, nuisance, trespass, and stigma caused by the Defendant's actions and inactions.

WHEREFORE, for all the reasons stated herein, the Plaintiffs request that this Court set this matter for jury trial and the Plaintiffs request that the jury:

1)  Find the Plaintiffs have suffered mental anguish from fear of disease caused by the Defendant ExxonMobil's actions and inactions;

2)  Find that the Defendant acted or failed to act in a manner that thereby caused harm to the Plaintiffs' physical and mental health;

3)  Find the Defendant's actions caused the mental anguish and fear of disease suffered by the Plaintiffs;

4) Find the Defendant guilty of Mental Anguish from Fear of Disease and liable to each Plaintiff for compensatory and future damages of $12 Million plus cost of suit;

5) Find that punitive damages are appropriate after a hearing is held by the Judge for such determination and upon finding that punitive damages are allowed and appropriate, find the Defendant liable for punitive damages up to $50 million.

## COUNT IX

## PERSONAL INJURY

1 Through 51.   The Plaintiff realleges and repeats paragraphs 1 through 51 of Count VIII as though fully stated herein.

52. Plaintiffs have been exposed to low levels of multiple chemicals which have had a "toxic cocktail" effect upon the physical bodies of the Plaintiffs. The exposure to the metals and chemicals in the gob dust have affected the Plaintiffs health negatively with unknown ramifications from the exposure. The Plaintiffs work in the dirt as produce farmers. Coal can contain a large number of various metals, some of which are know to be poisonous or be a possible cause of cancer and other health problems. The metals or elements found in Illinois coal as arsenic, beryllium, cadmium, cobalt, chromium, mercury, manganese, nickel, phosphorus, lead, antimony, selenium, thorium and uranium.

53. Plaintiffs have been injured in their persons by the actions and inactions of the Defendant.

WHEREFORE, for all the reasons stated herein, the Plaintiffs request that this Court set this matter for jury trial and the Plaintiffs request that the jury:

21

1) Find the Defendant ExxonMobil caused personal injury to the Plaintiffs by negligently acting or failing to act;

2) Find that the Defendant acted or failed to act in a manner that thereby caused harm to the Plaintiffs' physical and mental health;

3) Find the Defendant's actions were a breach of the standard of care and the proximate cause of personal injury to the Plaintiffs;

4) Find the Defendant liable to each Plaintiff for compensatory and future damages of $12 Million plus cost of suit;

5) Find that punitive damages are appropriate after a hearing is held by the Judge for such determination and upon finding that punitive damages are allowed and appropriate, find the Defendant liable for punitive damages up to $50 million.

## COUNT IX

### STRICT LIABILITY

#### (ULTRA HAZARDOUS ACTIVITY)

1 Through 51.  The Plaintiff realleges and repeats paragraphs 1 through 51 of Count VIII as though fully stated herein.

52.  The Defendant's activities of disposing of 271 acres of "gob" waste is an ultra hazardous activity.

53. Any harm caused by this ultra hazardous activity including makes the Defendant strictly liable.

22

54.  Plaintiffs were harmed by the ultra hazardous activity of the Defendant as expressed in other paragraphs.

WHEREFORE, for all the reasons stated herein, the Plaintiffs request that this Court set this matter for jury trial and the Plaintiffs request that the jury:

1) Find the Defendant's activities to be ultra hazardous;

2) Find that the Defendant's activities caused harm to the Plaintiffs' physical and mental health, to their property and to their businesses;

3) Find the Defendant Strictly liable for the damages caused by its activities and

4) Find the Defendant liable for $12 Million in compensatory damages plus cost of suit;

Respectfully submitted,

Jerry and Lana Korte

By: PENNI S. LIVINGSTON
    Attorney for Plaintiffs
    Attorney #06196480
    Livingston Law Firm
    6001 Old Collinsville Road
    Fairview Heights, Il. 62208
    618/628-7700

    (Address will be changed as of March 31st so
    please use new address below)

    4972 Benchmark Centre
    Suite 100
    Swansea, Illinois 62226
    618/628-7700

23