IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JEROME KORTE and LANA KORTE,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| vs. | ) CIVIL NO. 03-239-GPM |
| | ) |
| **EXXONMOBIL COAL USA, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

# MEMORANDUM AND ORDER

**MURPHY, Chief District Judge:**

The Court heard arguments on Defendant's motion for summary judgment and/or to dismiss on September 13, 2004. For the reasons set forth below, the motion is granted in part and denied in part.

BACKGROUND

This dispute results from the operation of a coal mine by Monterey Coal Company (a division of Defendant ExxonMobil Coal USA) on land near property owned by Jerome and Lana Korte ("the Kortes") near Germantown, Illinois. Mining operations began in early 1977 and ended in 1996. Since 1996, however, some activities at the former mining site have continued. A detailed history of the mine is included in Monterey's pleadings relating to its summary judgment motion. For the most part, the facts are undisputed.

The Court has subject matter jurisdiction under the diversity of citizenship statute, 28 U.S.C. § 1332. The Kortes are citizens of Illinois; Defendant ExxonMobil Coal USA, Inc., is a Delaware corporation with its principal place of business in Texas. (*See* Doc. 1, paras. 6-7.) The

complaint on its face establishes that the amount in controversy exceeds $75,000, exclusive of interest and costs, as the prayer for relief following each count seeks compensatory damages in excess of $12 million and punitive damages in an amount up to $50 million. (*See* Doc. 2.) Exercising its diversity jurisdiction, the Court applies the substantive law of the state of Illinois.

The main interest in this lawsuit is coal refuse disposal areas (RDAs) on Monterey's facility which encompass a surface area of approximately 300 acres. Refuse was placed in one of the RDAs from 1977 to 1996 and in the other RDA from 1988 to 1996. The Kortes have not lived on their property since January 2002, but they continue to grow crops and raise animals on it.

The complaint consists of ten counts and seeks a variety of damages under many theories. On the record at the recent hearing, the Kortes' counsel conceded that most of the claims fail or are unnecessary, and the only damages sought are for personal injury (respiratory illness and emotional distress), groundwater contamination, and punitive damages. (*See* Transcript of 9/13/04 hearing at pp. 5-9, 11.) For this reason, all counts except those for common law nuisance and trespass (Counts I, III, and V) and all damage claims except for personal injury, groundwater contamination, and punitive damages are dismissed. These claims are discussed below.

## ANALYSIS

Summary judgment is proper where the pleadings and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Wyatt v. UNUM Life Ins. Co. of America*, 223 F.3d 543, 545 (7th Cir. 2000); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law. *Wollin v. Gondert*, 192 F.3d 616, 621-22 (7th

Cir. 1999). The Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1057 (7th Cir. 2000); *Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir. 1999).

The non-moving party has the burden to prove that "it is entitled to judgment under established principles." *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1222 (7th Cir. 1987). It cannot simply rest on its pleadings. If it does not discharge that burden, then it is not entitled to judgment. *Id.*

As stated above, the only remaining claims are for common law nuisance and trespass. Thus, the issue becomes whether the Kortes can survive summary judgment on these claims and, if so, what damages they are entitled to seek. The Kortes bear the burden of establishing the essential elements of their claim. Summary judgment is proper if the Kortes fail to produce evidence sufficient to demonstrate a genuine issue of material fact as to any element of their claim, including proximate cause. *See Celotex*, 477 U.S. at 322. Because the issues of whether a coal mine could cause personal injuries and groundwater contamination are "not within the ken of the ordinary person," expert testimony is needed for the Kortes to prove their case. *Goffman v. Gross*, 59 F.3d 668, 672 (7th Cir. 1995).

Whether the Kortes can survive summary judgment turns on whether their experts can survive a challenge based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Without expert testimony, the Kortes cannot prove causation, and their claims fail. *Daubert* requires the trial judge perform a gatekeeping function with respect to expert testimony. The trial judge must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id*. at 589. An inquiry is also required for technical and other specialized expert testimony. *See*

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).  The Seventh Circuit, interpreting *Daubert*, has established that when evaluating the admissibility of the proffered testimony, district courts are to undertake a two-step inquiry:

> Daubert first "directs the district court to determine whether the expert's testimony pertains to scientific knowledge.  This task requires that the district court consider whether the testimony has been subjected to the scientific method; it must rule out 'subjective belief or unsupported speculation.'" Second, the district court must "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue.  That is, the suggested scientific testimony must 'fit' the issue to which the expert is testifying."

*O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir. 1994) (quoting *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 613 (7th Cir. 1993) (citations omitted)).

While the Supreme Court did "not presume to set out a definitive checklist or test," it did list several factors that should be considered including: (1) whether a scientific theory or technique has been or can be tested; (2) whether the scientific theory has been subjected to peer evaluation and publication; (3) the actual or potential error rate and existence of any standards controlling the technique's operation; and (4) whether the theory has been generally accepted in a particular field. *Daubert*, 509 U.S. at 595.  The test of reliability, however, is flexible; there is no requirement that the district judge consider each one of the factors when making an admissibility ruling.  *Id.*; *See also Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 535 (7th Cir. 2000).

The purpose of the rule in *Daubert* "was to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded of their professional work." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).  Federal Rule of Evidence 703 explicitly permits reliance on material "reasonably relied upon by experts in the particular field

forming opinions or inferences." FED. R. EVID. 703. "[Seventh Circuit] case law has recognized that experts in various fields may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion." *Cooper v. Nelson*, 211 F.3d 1008, 1020 (7th Cir. 2000). An expert must be limited to opinion testimony in the area of expertise for which the proffering party can qualify the expert. *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600 (7th Cir. 2000). Once qualified, an expert can testify to his or her area of expertise, regardless of whether the expert is prepared to offer an opinion as to the ultimate issue. *Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000).

**Claims for Personal Injury**

The Kortes' treating osteopath, Dr. Wells, fails to provide testimony on the issue of causation with respect to the claims for personal injury. While Dr. Wells noticed that the Kortes suffered from sinus problems and tearing of the eyes, he cannot say that the mine had anything to do with these conditions. Instead, the Kortes try to use a retained expert, Dr. Orris, to get them where they need to be by asking Dr. Orris to rely on the conditions Dr. Wells documented through the years.

Dr. Orris is a medical doctor who specializes in occupational medicine. He is not a certified toxicologist. Monterey argues that his opinions that the Kortes' health problems resulted from coal mine dust should be excluded because he fails to base his opinions on quantitative data. Instead, he relies primarily on the Kortes' own accounts concerning the presence of dust – without even being able to opine that the dust the Kortes have seen on their land is coal dust (the area is also home to a lot of farming operations and dirt roads). And, according to Monterey, Dr. Orris completely disregarded sampling that was completed by state agencies.

The Court agrees with Monterey that the opinions of Dr. Orris do not meet the admissibility

standards of Federal Rule of Evidence 702 and *Daubert*. Dr. Orris's methods and logical processes are unreliable. He relies on no epidemiological studies, he fails to take into consideration the existing dust samples, and he fails to exclude possible alternative causes for the Kortes' health problems. Dr. Orris's opinions are not subject to testing because it appears that he started from the conclusion (reached by the Kortes) that the dust is the cause for their health problems, and he provides no medical tests to verify his opinions. It is concerning too that he fails to consider that the Kortes' symptoms could be caused by many things, including seasonal allergies, pesticides, or cigarette smoking. Dr. Orris never tested the dust at the Kortes' home or even visited their property.

The Court reaches the same conclusion with respect to the Kortes' claims that contamination of their well has caused personal injury. While the testimony of Dr. Yarbrough is discussed in more detail below, the Court notes at this juncture that neither Dr. Orris nor Dr. Yarbrough is qualified to give such an opinion. Dr. Yarbrough is not an expert in toxicology or medicine. He has nothing on which to support an opinion that any medical condition experienced by the Kortes was in any way caused by Monterey. Dr. Orris concedes, as he must, that Mr. Korte's indigestion and diarrhea could be caused by bacteria and E.coli found in the Kortes' well by the Illinois Department of Public Health. His reliance on the opinion of Dr. Yarbrough is not justified, given Dr. Yarbrough's lack of qualifications and testing.

Dr. Orris's opinions would not assist the jury in understanding the evidence or deciding the issue of causation. In fact, quite to the contrary, Dr. Orris's opinions are more likely to confuse the jury. As in the case of *Wintz v. Northrop Corp.*, 110 F.3d 508 (7th Cir. 1997), Dr. Orris's experience, knowledge, and methodology are insufficient to permit him to offer an expert opinion applying the principles of toxicology to human beings. Dr. Orris's opinions are nothing more than unsupported

speculation, and they are not admissible.

The Kortes have failed to establish a genuine issue of material fact as to whether any activity at the mine was a proximate cause of their personal injuries. Accordingly, Monterey is entitled to summary judgment on the claims for personal injury.

**Claims for Groundwater Contamination**

The Kortes claim that the mine has also contaminated their well water, making it impossible for them to drink the water, feed the livestock, or water the crops. According to Mrs. Korte, black slugs have appeared in their water occasionally since 2001 – five years after the mine closed. When they appear, the slugs last only a few minutes before the water clarifies. Testing by the Illinois Department of Public Health found two problems with the Kortes' well – it contains elevated levels of sodium and E.coli. No one, however, links either problem to the mine.

Nonetheless, the Kortes seek to offer the testimony of Dr. Yarbrough to prove that these occasional black slugs are caused by Monterey. Dr. Yarbrough holds an undergraduate degree in geology, a Master's degree in Physical Geography, and a Ph.D. in Economic Geography. He is not an expert hydrologist or chemist, and he has no training in groundwater modeling. But if allowed, he would tell the jury that Monterey is contaminating the Kortes' well because activities at the former mining site cause groundwater to flow onto the Kortes' land. For this to happen, however, it is undisputed that the groundwater would have to flow *upgradient* for over a mile. Dr. Yarbrough's theory on this process is referred to by Monterey as his groundwater "velocity theory."

Unfortunately for the Kortes, however, this theory fails to meet the standards of *Daubert*. Even assuming Dr. Yarbrough's experience qualifies him to render such an opinion (a doubtful proposition), his theory is untested and unverified. Dr. Yarbrough only concocted the theory after

being forced to abandon his original theory that contaminants from the mine were making their way to the Kortes' property in light of extensive data to the contrary. Dr. Yarbrough has not tested his theory. He did not determine an error rate. He cannot correlate the slugs in the Kortes' well to pumping at Monterey's facility, and he has done no modeling. The theory certainly fails to pass the peer review prong of a *Daubert* analysis, as it has left one of Dr. Yarbrough's peers "scratching his head." (*See* Yarbrough Depo. at p. 156.)

Perhaps more importantly, there is overwhelming evidence that the cause of discolored water at the Kortes' home may be naturally occurring conditions and/or a result of poor well maintenance. There is also evidence that discolored water is prevalent in the Germantown area and that the discoloration predates not only the operation of the mine but its existence. Dr. Yarbrough ignored these potential alternative causes and did nothing to investigate alternative causes on his own. Like Dr. Orris, the Court finds that the testimony of Dr. Yarbrough would not only fail to help the jury decide the issue of causation, but it would likely confuse the issue greatly. His testimony is not admissible.

Without expert testimony on the issue of causation as to the Kortes' claims for groundwater contamination, Monterey is entitled to summary judgment.

**Claim for Trespass**

"One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally (a) enters land in the possession of the other, or causes a thing or a third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which he is under a duty to remove." RESTATEMENT (SECOND) OF TORTS § 158. Without expert testimony to show that either dust or groundwater has made its way

from Monterey's facility to the Kortes' property, there is no claim for trespass.

**Claims for Punitive Damages**

Finally, the Court finds that the Kortes have failed to make a submissible case on punitive damages. Under Illinois law, "punitive damages should not be awarded absent a finding of culpability that exceeds bad faith." *See Medcom Holding Co. v. Baxter Tavenol Labs., Inc.*, 106 F.3d 1388, 1402 (7th Cir. 1996). There is simply no evidence of any bad faith on behalf of Monterey. The undisputed evidence before the Court is that Monterey has worked in cooperation with environmental authorities to address environmental issues. Accordingly, Monterey is entitled to summary judgment on the claim for punitive damages.

CONCLUSION

Accordingly, the motion for summary judgment and/or to dismiss (Doc. 60) is **GRANTED in part and DENIED in part**. Counts II, IV, V, VI, VII, VIII, IX, and X and all claims for damages other than for common law nuisance are **DISMISSED with prejudice**.

Trial on the nuisance claim is set for **Tuesday, January 11, 2005, at 8 a.m.** A final pretrial conference will be held on **Monday, December 20, 2004, at 9:30 a.m.** The parties are encouraged to review the Court's website at www.ilsd.uscourts.gov for detailed explanation of the undersigned's final pretrial requirements.

**IT IS SO ORDERED.**

DATED: 11/08/04

                                                s/ G. Patrick Murphy
                                                G. PATRICK MURPHY
                                                Chief United States District Judge